# EXHIBIT 1

# NEW YORK SUPREME COURT
# NEW YORK COUNTY

JENNIFER LEGRIER, individually and on behalf of all others similarly situated,

**SUMMONS**

Plaintiff,

-against-

Index No.
Purchased on        June 15, 2025

KRAFT HEINZ FOOD COMPANY,

Defendant.

To the above-named Defendant:

**PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** to answer the Complaint of the Plaintiff and to serve a copy of your Answer on the Plaintiff at the attorney address indicated below within 20 days after service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the Summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer, a judgment will be entered against you by default for the relief demanded in the Complaint.

June 15, 2025

/s/Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

Plaintiff Legrier designates New York County as place of trial. The basis of venue is:

☒    Plaintiff Legrier's residence, 654 Water St New York NY 10002

☐    Where a substantial part of the events or omissions giving rise to the claim occurred

☐    Other

# NEW YORK SUPREME COURT
# NEW YORK COUNTY

| | |
|---|---|
| JENNIFER LEGRIER, individually and on behalf of all others similarly situated, | Index No. |
| Plaintiff, | |
| - against - | Class Action Complaint |
| KRAFT HEINZ FOOD COMPANY, | Jury Trial Demanded |
| Defendant. | |

Jennifer Legrier ("Plaintiff"), through Counsel, alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. As factories replaced farms in the late nineteenth century, the population of the United States shifted towards urban centers.

2. The inability to garden, hunt, and/or harvest left them at the mercy of the distant manufacturer and canner.

3. In place of the "pure foods" previously produced on a small scale, Americans were forced to accept unsanitary and dangerous foods, chronicled most notably in Upton Sinclair's 1905 serial "The Jungle: A Story of Chicago."

4. The corollary to production of such low quality foods, whether based on vegetables, meats, grains, or confections, was the need for specialized substances, known as "additives."

5.     This term encompasses non-food substances, created in laboratories, to fulfill various, non-mutually exclusive functions, such as facilitating processing ("processing aids"), improving appearance ("coal tar dyes," rebranded as "colorants"), increasing bulk ("fillers" and "thickeners"), creating or enhancing taste ("flavorings"), facilitating the suspension of one liquid in another ("emulsifiers"), and extending shelf-life, concealing inferiority, and slowing deterioration ("preservatives").

6.     The most potent of these were the preservatives.

7.     Once limited to sugar, salt, vinegar, and spices, the packers and canners devised more potent substances.

8.     They employed industrial chemists, who developed novel Frankenstein-like chemicals, with names like borax, salicylic acid, and formaldehyde.

9.     These went beyond keeping food fresh a few days longer, by disguising unsanitary production practices, preventing foodborne illness from spoiled raw materials, concealing inferior quality, and/or maintaining minimal quality, for significantly longer.

10.     Public opposition to these chemicals is just as strong today.

11.     This is confirmed by research from Nielsen and Mintel, indicating that almost ninety percent of Americans are willing to pay more for healthier foods, understood as those without synthetic preservatives.

Case 1:25-cv-06766    Document 1-1    Filed 08/15/25    Page 5 of 24

12.    Other research indicates that almost all consumers rate chemicals in food among their top concerns, higher than foodborne illness.

13.    Since "It's nearly impossible to keep up with which ingredients are safe to eat and which ones cause some kind of harm," public health advocates encourage sound nutritional, health, and/or lifestyle choices, by relying on heuristics, and "extrinsic cues,"[1] seeking foods which promote the absence of synthetic preservatives.

14.    This "rule of thumb" serves two purposes.

15.    First, it recognizes the potential harms and/or adverse effects of such ingredients.

16.    This is based on the widespread belief, media reports, and/or studies, that synthesized chemicals of any kind are not necessarily safe, and/or may pose health

---

[1] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013; Clement, J., Visual Influence on In-Store Buying Decisions: An Eye-Track Experiment on the Visual Influence of Packaging Design, Journal of Marketing Management, 23, 917-928 (2007); Gupta K, O. et al., Package Downsizing: Is it Ethical? 21 AI & Society 239-250 (2007).

3

Case 1:25-cv-06766    Document 1-1    Filed 08/15/25    Page 6 of 24

risks.[2] [3]

17.   The International Food Information Council ("IFIC") found that almost thirty percent of the public consider these compounds a top concern.[4]

18.   In fact, "research has shown [that additives like synthetic preservatives] are either bad for people to consume or inconclusively so."[5]



19.   Second, since artificial preservatives are often a "marker" for ultra processed foods ("UPF"), a main contributor to diet-related illnesses, such as diabetes, their avoidance is consistent with promoting positive dietary patterns.

---

[2] Cary Funk et al., Public Perspectives on Food Risks, Pew Research Center, Nov. 19, 2018.

[3] Bhavana Kunkalikar, Processed Danger: Industrial Food Additives and the Health Risks to Children, News-Medical.net, May 23, 2023 (citing recent study in the Journal of the Academy of Nutrition and Dietetics).

[4] Tom Neltner, Environmental Defense Fund, Chemicals Policy Director, Chemicals in Food Continue to be a Top Food Safety Concern Among Consumers, Food Navigator, Sept. 20, 2021.

[5] Frank Giustra, You Might Be Surprised by What's in Your Food, Modern Farmer, Feb. 8, 2021.

20.  To appeal to purchasers who try and avoid foods with non-natural ingredients, which function, or can function, to prevent, among other things, deterioration, Kraft Heinz Food Company ("Defendant") manufactures, labels, markets, packages, designs, distributes, and/or sells, 7.25 ounce boxes of macaroni and cheese, promising "No Artificial Flavors, Preservatives, or Dyes" ("Product").



21.  The Product is "misbranded,"[6] because despite promising "No Artificial [] Preservatives," the ingredient list,[7] in fine print on the side of the box, reveals

---

[6] "Misbranded" is the statutory term for labeling that is false and/or misleading. "Adulterated" is the statutory term meaning to "render (something) poorer in quality by adding another substance, typically an inferior one."

[7]  **INGREDIENTS:** ENRICHED MACARONI (WHEAT FLOUR, DURUM

"Citric Acid," a non-natural, synthetic ingredient, which, tends to, does, and/or can, function as a preservative in this food. AGM § 201(1).[8]



FLOUR, NIACIN, FERROUS SULFATE [IRON], THIAMIN MONONITRATE [VITAMIN B1], RIBOFLAVIN [VITAMIN B2], FOLIC ACID), CHEESE SAUCE MIX (WHEY, MILKFAT, SALT, MILK PROTEIN CONCENTRATE, SODIUM TRIPHOSPHATE, CONTAINS LESS THAN 2% OF TAPIOCA FLOUR, CITRIC ACID, CALCIUM PHOSPHATE, SODIUM PHOSPHATE, LACTIC ACID, WITH PAPRIKA, TURMERIC, AND ANNATTO ADDED FOR COLOR, CHEESE CULTURE, ENZYMES).

[8] Article 16, Weights and Measures, AGM § 176 *et seq*., Article 17, Adulteration, Packing, and Branding of Food and Food Products, AGM § 198 *et seq*.; Official Compilation of Codes, Rules and Regulations of the State of New York ("N.Y.C.R.R."), 1 N.Y.C.R.R. Part 221 ("Commodities"); Title 1, Department of Agriculture and Markets, Chapter VI, Food Control, Subchapter C, Food and Food Products (Article 17, AGM), including 1 N.Y.C.R.R. § 250.1, 1 N.Y.C.R.R. § 259.1(a).

22.  Until the early twentieth century, citric acid was obtained from citrus fruits, such as lemons.

23.  Increase in demand, and consumption of citrus required new sources.

24.  Today's citric acid is "a major industrial chemical," "made from *Aspergillus niger* (aka: black mold)…that comes [usually] from sugar sourced from genetically modified corn or beets," or even cassava.

25.  Recovering this synthetic agent requires fermentation, numerous chemical reactions, artificial mineral salts, and/or reagents.



26.  First, the filtrate is treated with lime solution or calcium carbonate.

27.  This chemical reaction forms tri-calcium citrate tetra hydrate, treated with sulfuric acid, in acidolysis reactors.

28.  Then, the solution is purified through activated charcoal columns and/or ion exchangers.

7

FILED: NEW YORK COUNTY CLERK 06/15/2025 09:44 PM
NYSCEF DOC. NO. 2    Case 1:25-cv-06766    Document 1-1    Filed 08/15/25    Page 10 of 24

INDEX NO. 157632/2025
RECEIVED NYSCEF: 06/15/2025

29. Finally, it is dried and/or milled into a fine citric acid powder, stacked in bags for shipping.




30. Though the ingredients identify citric acid as part of a "Cheese Sauce Mix," this appears compositionally similar to an enzyme-modified cheese ("EMC") powder.

31. While cheese powders are low in water activity, they are still subject to various factors which can cause deterioration.

32. The addition of citric acid goes beyond having a positive impact on a cheese powder's taste.

i. Acidulant

33. Scholarly publications confirm citric acid is used in cheese powders for "pH adjustment," which is a synonym for an "acidulant."

**Table 18.9.** Ingredients and their roles in cheese powder and seasoning formulation.

| Ingredient used | Functionality |
|---|---|
| Cheeses | Flavor quality and intensity |
| Salt | Taste and adhesion of seasoning to snack |
| Corn starch | Adhesion of seasoning |
| Spices: onion, garlic, pepper, mustard | Variety of flavors |
| Citrates/phosphates | Cheese-emulsifying salts, slurrying agents |
| Lactic acid | Acid flavor |
| Enzyme-modified cheese and enzyme-modified butter oil | Flavor booster/rounded flavor |
| Maltodextrins | Carrier, no-flavor impact/flow agent |
| Corn syrup solids | Sweet rounded flavor/carrier/flow agent |
| Whey/whey products/lactose | Filler/flavor carriers, dairy flavor, cost control, effective coating |
| Vegetable oil | Adhesion/filler |
| Monosodium glutamate/autolyzed yeast extract | Flavor booster |
| Citric acid/sodium citrate | pH adjustment |
| Color | Appearance improvement |
| Tomato powder | Color and flavor |
| Sodium silicoaluminate/silica dioxide/magnesium carbonate | Flow agents (anti-caking) |
| Propylene glycol/wetting agent | Antidust agent |

34.   In fact, the Canadian version of the Product identifies citric acid as an "Acidulant" in its ingredients.



35.   A patent held by Defendant, a subsidiary, or predecessor, described the production of "Dry-powdered cheese compositions [and] method of making and cheese product."[9]

36.   This discussed citric acid's ability not only to "thicken[] the cheese slurry," but to "reduce the pH of the cheese slurry," which is why it was added as a

---

[9] WIPO (PCT)WO2016172100A1.

"a pH-modifying agent."

37.  Citric acid's effect on pH helps ward off *Salmonella*, a constant risk with dairy products like cheese powders.

38.  By lowering the pH, or increasing acidity, bacteria like *Salmonella* are a decreased risk.

ii.  Antioxidant

39.  Cheese powders may be stored for long periods prior to usage.

40.  Having relatively high fat contents, they are vulnerable to lipid oxidation and rancidity, upon exposure to oxygen and/or light.

41.  The negative effects may increase with temperatures, producing hydroperoxides.

42.  These compounds cause malodor, off-flavors, and decrease in key volatile flavor compounds.

43.  Beyond sensory attributes, lipid oxidation may contribute to greater susceptibility to oiling-off and free fat formation.

44.  Free fat in cheese powder leads to lumpiness, flow problems, and/or flavor deterioration.

45.  According to Kosikowski, storage of cheese powders also results in nonenzymatic browning.

46.  This occurs because they contain lactose, a reducing sugar that can

interact with amino acids.

47.    The detrimental effects include brown discoloration, off-flavor, and/or degradation of nutritional value.

48.    To limit lipid oxidation and/or non-enzymatic browning, and increase shelf-life, antioxidants, like citric acid, may be added at low levels.

49.    This chemical is an oxygen scavenger, that can prevent prevent rapid flavor and/or quality deterioration, and/or rancidity

50.    One scholar described antioxidants as not improving the quality of a cheese powder, but helping to maintain it, and extend shelf-life, by preventing oxidation of labile lipid components.

### iii. Chelating Agent

51.    Citric acid can, and/or does, function as a chelating agent.

52.    By binding to metal ions, citric acid can prevent them from causing unwanted reactions, oxidation, and/or being available for bacterial growth.

### iv. Emulsifying Effects

53.    Citric acid has been shown to be a potent phase stabilizer in the production of cheese powders.[10]

54.    This is due its ability to solubilize protein, thereby increasing its ability

---

[10] Kilara 1985.

to emulsify fat

55.  The above-identified functions indicate how citric acid (i) prevents degradation of flavor and/or quality, (ii) improves physical and/or chemical stability, (iii) enhances color and appearance, (iv) helps to maintain an original taste longer, by preventing off-flavors, (v) prevents spoilage from yeasts, molds, and/or bacteria, like *Salmonella*, and/or (vi) inhibits rancidity.

56.  This is because citric acid is a "chemical[] that, when added to [the Product and/or its components], tends to prevent or retard deterioration." 1 N.Y.C.R.R. § 259.1(a).

57.  As a result of the false and misleading representations and omissions, the Product is sold at a premium price, approximately $1.19.

58.  This price is higher than the Product would be sold for, if it were represented in a non-misleading way.

59.  This will, and/or can be, determined through methods including conjoint analysis, choice analysis, choice-based ranking, hedonic pricing, and/or other similar methods, which evaluate a product's attributes, and/or features.

60.  By determining the willingness to pay of consumers for products, including the Product at issue, with and/or without the challenged claims, the value of the challenged claims can be reduced to a monetary value.

## JURISDICTION

61. Plaintiff Legrier is a citizen of New York.

62. Plaintiff Legrier is a resident of New York County, New York.

63. The Court has jurisdiction over Defendant, because it transacts business within New York, and sells the Product to consumers within New York, through stores, in this State, to citizens of this State.

## VENUE

64. Venue is in this Court, because Plaintiff Legrier's residence is in New York County.

## PARTIES

65. Plaintiff Legrier is a consumer, not a merchant or re-seller.

66. Plaintiff Legrier is a citizen of New York.

67. Plaintiff Legrier is a resident of New York County, New York.

68. Defendant Kraft Heinz Food Company is a Pennsylvania limited liability company, with a principal place of business in Pennsylvania.

69. Plaintiff is like most, or many consumers, and looks to labeling and/or packaging of foods, to see what she is buying, and/or to learn basic information about them.

70. Plaintiff is like most, or many consumers, and is accustomed to labeling and packaging telling her about a food's significant characteristics, attributes,

13

nutrition, quantity, qualities, ingredients, and/or features.

71.    Plaintiff is like most, or many consumers, who try, where possible, to avoid foods with chemical, non-natural, and/or less natural ingredients, which serve, or could serve, preservative functions, believing them to be potentially harmful, not or less natural, less healthy, and/or indicative of lesser quality foods.

72.    Plaintiff read, was exposed to, relied on, and/or was caused to pay more money as a result of, "No Artificial [] Preservatives," to believe the Product did not contain artificial, synthetic ingredients, which served, or could serve, preservative functions.

73.    Plaintiff bought the Product, with the labeling and packaging identified here, at or around the above-referenced price.

74.    Plaintiff purchased the Product, between July 2022 and May 2025, at stores, in New York.

75.    Plaintiff paid more for the Product than she would have, had she known it contained artificial and/or synthetic ingredients, which served, or could serve, preservative functions, as she would have paid less.

76.    The Product was not "worthless" to Plaintiff, but worth less, than what Plaintiff paid, and she would not have paid as much, absent Defendant's false and misleading statements, and/or omissions.

77.    Plaintiff obtained value from the Product, because it tasted good, but

seeks the cost difference between the Product, as presented, and as delivered.

78. The Product's features and/or attributes, when taken together, and/or utilized for the purpose of conjoint analysis, choice analysis, choice-based ranking, hedonic pricing, or other similar methods, impacted Plaintiff's purchasing choice, compared to similar products lacking its features and/or attributes.

## CLASS ALLEGATIONS

79. Plaintiff is a consumer, not a re-seller or merchant.

80. Plaintiff seeks to represent other consumers, in the class identified below, against a big business:

> Only citizens of New York, who purchased the Product, for personal consumption and/or use, in New York, during the statutes of limitations.

81. Plaintiff's claims are based upon New York's General Business Law ("GBL") §§ 349 and 350, passed by the legislature, to protect the New York public, and unsophisticated New York consumers, against large and sophisticated businesses.

82. Excluded from the Class are (i) Defendant, Defendant's board members, executive-level officers, members, attorneys, and immediate family, (ii) governmental entities, (iii) the Court, the Court's immediate family, and Court staff, (iv) any person that timely and properly excludes himself or herself from the Class, (v) non-citizens of New York, (vi) persons who bought the Product outside New

Case 1:25-cv-06766    Document 1-1    Filed 08/15/25    Page 18 of 24

York, (vii) persons who used or consumed the Product outside New York, (viii) persons who may be citizens of more than one state, and (ix) any persons who would otherwise be eligible to be a part of the Class, but seek to pursue statutory penalties, as opposed to actual damages.

83.    Common questions of issues, law, and fact predominate, and include whether Defendant's representations were, and are misleading, and if Plaintiff and class members are entitled to damages.

84.    Plaintiff's claims and basis for relief are typical to other members, because all were subjected to the same unfair, misleading, and/or deceptive representations, omissions, and/or actions.

85.    Plaintiff is an adequate representative, because her interests do not conflict with other members.

86.    No individual inquiry is necessary, since the focus is only on Defendant's practices, and the class is definable and ascertainable.

87.    Individual actions would risk inconsistent results, be repetitive, and/or are impractical to justify, as the claims are modest, relative to the scope of the harm.

88.    The class is sufficiently numerous, because the Product has been sold throughout the State for several years, with the representations, omissions, packaging, and/or labeling identified here, from stores in this State, to citizens of this State.

Case 1:25-cv-06766    Document 1-1    Filed 08/15/25    Page 19 of 24

89.  Plaintiff does not seek any penalty as a measure of damages.

90.  To the extent required, Plaintiff waives recovery of any penalty as a measure of damages, and in the event persons wish to seek such penalties, they may opt-out of the proposed class.

91.  Plaintiff's Counsel is competent and experienced in consumer class action litigation, and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
New York General Business Law ("GBL") §§ 349 and 350

92.  To the extent required, this section incorporates by reference other paragraphs, as necessary.

93.  The purpose of the GBL is to protect New York consumers against unfair and deceptive practices.

94.  The GBL considers false advertising, unfair acts, and deceptive practices, in the sale of consumer goods, to be unlawful.

95.  Violations of the GBL can be based on (1) other laws and standards related to consumer deception, (2) public policy, established through statutes, laws, or regulations, (3) principles of other jurisdictions, (4) decisions with respect to those principles, (5) any rules promulgated pursuant to acts designed to prevent deception, and/or (6) standards of unfairness and deception set forth and interpreted by other

17

agencies, entities, tribunals, and bodies.

96.   Defendant's false and deceptive representations and omissions, with respect to the Product's contents, origins, nutrient values, servings, ingredients, flavoring, taste, type, functionality, amount, quantity, and/or quality, were material in that they were likely to influence consumer purchasing decisions.

97.   The packaging and labeling of the Product violated the GBL, because the representations, omissions, design, markings, and/or other elements, including, "No Artificial [] Preservatives," caused purchasers to expect it did not contain non-natural, and/or synthetic ingredients, which performed, or could perform, preservative functions, which was unfair and deceptive to consumers.

98.   The packaging and labeling of the Product violated laws, statutes, rules, regulations, and/or norms, which prohibit unfair, deceptive, and/or unconscionable conduct, against the public.

99.   The packaging and labeling of the Product violated the GBL, because the representations, omissions, design, markings, and/or other elements, including, "No Artificial [] Preservatives," caused purchasers to expect it did not contain non-natural, and/or synthetic ingredients, which served, or could serve, preservative functions, contrary to statutes and/or regulations, which prohibit consumer deception by companies in the labeling of food products.

100. Plaintiff paid more for the Product, and/or would not have paid as much,

if she knew that it contained non-natural, artificial, and/or synthetic ingredients, which served, or could serve, preservative functions.

101. Plaintiff seeks to recover for economic injury and/or loss she sustained, based on the misleading labeling and/or packaging of the Product, a deceptive practice under the GBL.

102. Plaintiff may produce evidence showing how she and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and/or labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, choice-based ranking, and/or other advanced methodologies.

103. This means individual damages will be based on the value attributed to the challenged claims, practices, and/or omissions, a percentage of the total price paid, instead of the Product's total price.

104. This is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for, without the misleading labeling, packaging, representations, statements, omissions, and/or marketing, identified here.

105. This difference is typically between five ($0.05) and sixty cents ($0.60) per unit, a small fraction or percentage of the total price.

106. As a result of Defendant's misrepresentations and omissions, Plaintiff

was injured, and caused to suffer economic or financial damages, by payment of the above-identified price premium for the Product.

107. Plaintiff was caused to pay more than she would have paid for the Product, based on the identified misrepresentations and/or omissions.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff seeks:

1. To declare this a proper class action, certifying Plaintiff as representative, and the undersigned as Counsel for the Class; and

2. Actual damages, but neither (1) a penalty, nor minimum measure of recovery created or imposed by statute, which may be prohibited, (2) full value damages, nor (3) punitive damages.

June 15, 2025

Respectfully submitted,

/s/  Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel  (516) 268-7080
Fax (516) 234-7800
spencer@spencersheehan.com

Notice of Lead Counsel Designation:

Lead Counsel for Plaintiff

Spencer Sheehan

20

Sheehan & Associates P.C.

Counsel for Plaintiff

### Certificate of Service

I certify, that on June 15, 2025, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|           | Electronic Filing | First-Class Mail | Email | Fax |
|-----------|:-:|:-:|:-:|:-:|
| Defendant | ☐ | ☐ | ☐ | ☐ |
| Plaintiff | ☒ | ☐ | ☐ | ☐ |
| Court     | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan